UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH

CASE NO. 25-CR-80071-Damian

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

TATYANA ALEXSANDROVNA SMELIK,

    Defendant.

_____/

## **DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO PSI**

Defendant Tatyana Smelik, through counsel, hereby submits her sentencing memorandum.

**A. Introduction**

Defendant Tatyana Alexsandrovna Smelik respectfully submits this memorandum to assist the Court in determining a just and reasonable sentence pursuant to 18 U.S.C. § 3553(a).

Ms. Smelik pled guilty to Count 1 of a ten-count indictment charging a violation of 18 U.S.C. § 1546(a) for making a false statement in an immigration application.

Ms. Smelik is a 47-year-old naturalized U.S. citizen with no prior criminal history. She has complied with all conditions of release, maintained employment, and shown genuine remorse.

A sentence sufficient but not greater than necessary under § 3553(a) should reflect her limited intent, extraordinary acceptance of responsibility, and long record of law-abiding conduct.

**(1) Miscellaneous Items to be Addressed in PSI by Paragraph:**

- 52) the couple later divorced in 2021 (not 2020).

- 53) the defendant married Alexey Kuznetsov in Delray Beach (not Hallandale). The couple later separated in March 2025 (they are not divorced).

- 68) the defendant worked as a real estate agent (she was not employed, she was an independent contractor). She earned $8,640 during the time she worked as an independent contractor (she was not employed).

- 72) ShopFans runs a website for consumers to buy designer products… (delete "gift cards and")

- 73) The company maintains a corporate checking account at Wells Fargo Bank (not Chase).

- 86) Assets. It is not accurate to include the bank account balance of Klaryuna in Tatyana's net worth. This bank account has working capital that is always going in and out to purchase inventory. In reality, she gets $1,000/month and the company has no real value beyond that. Her total assets should not include this account, nor should her total net worth.

- 86) Monthly Income. If she loses her real estate license, she will not receive real estate commissions of $2,043/month on average, so this should not be included in her total monthly income.

- 103) the extension for her 2024 personal income tax return is until October 15, 2025 (not the end of October).

**B. 18 U.S.C. Section 3553(a) - "Booker" Factors:**

**(1) The Nature and Circumstances of the:**

   **(A) History and Characteristics of the Offenses**

The offense arises from Ms. Smelik's submission of multiple Form I-134A "Petition to Be a Financial Sponsor" filings to the U.S. Citizenship and Immigration Services (USCIS). Between January 2023 and July 2024, she electronically filed approximately 152 petitions, falsely certifying on forty-nine occasions that she had not previously filed a petition for another beneficiary. These forms were part of the federal program allowing U.S. residents to sponsor Ukrainians and other foreign nationals seeking parole during the ongoing war in Ukraine.

After the Russian invasion of Ukraine in 2022, Ms. Smelik began helping friends and acquaintances complete petitions because they were fearful and needed assistance. Her conduct, though unlawful, resulted from empathy and urgency in a humanitarian crisis, not for personal gain.

While the offense involved repeated false statements, it lacked the hallmarks of a for-profit or deceit-for-gain scheme. The record supports treating it as an isolated, non-financially-motivated series of misguided acts of altruism.

   **(B) History and Characteristics of the Defendant**

Ms. Smelik's background and record reflect a consistent pattern of hard work, self-sacrifice, and compassion. Ms. Smelik was born in Marhanets, Ukraine, and raised in a close, hard-working family that valued honesty and community.

She immigrated to the United States at the age of eighteen, became a naturalized U.S. citizen in 2004, and has spent nearly three decades contributing productively to this

3

country. Her offense conduct, while serious, is best understood against this lifelong backdrop of service to family, friends, and strangers.

Her parents, **Valentina and Alexander Malov**, wrote, "We want to express our pride in having such a daughter, who can't be more caring, kind, disciplined, hard working, selfless and wise." They recounted how, when Mr. Malov underwent open-heart surgery, Ms. Smelik "came to Spokane and was assisting him in the recovery process." See Exhibit A.

**Alexander and Tatyana L. Smelik (former Parents-in-law)**, who had to flee the war in Ukraine in 2022, stated that their daughter-in-law stepped in many times during their difficult first year in America to help them with documents and various situations because their son could not always assist. They strongly believe that Ms. Smelik's intention "was just to help Ukrainian people to avoid the horror of the war". See Exhibit B.

Her former husband, **Valeriy Smelik**, echoed the same theme: "At difficult times besides being a wife and mother, she worked two jobs, to be able to support and provide for our children." He added that after their divorce she "taught her family and our children to put bitterness aside and keep a nice relationship with me." See Exhibit C.

Her youngest son, **Eelia Smelik**, wrote, "She has given everything of herself to ensure my well-being and success, often putting my needs before her own." See Exhibit D.

**Nikita Smelik,** Ms. Smelik's 21-year-old son, described her love for him as "selfless, one that will set aside the needs or wants of herself for the joy of her son". See Exhibit E.

4

Her sister-in-law, **Oxsana Malov**, emphasized that "She's an honest, kind-hearted woman with a strong character, and her one charge is not an accurate reflection of what a wonderful person she is."  See Exhibit F.

**Sergey and Iryna Rodionov**, parents of two boys from the bomb-stricken city of Sumy, wrote that "She offered her help and filed for us for the U4U program. With her help we were able to come to US. Her help didn't end there. She offered her house and a car in the beginning, for the first period." They added, "We, being parents, are grateful to Tatyana, that our children are able to live and go to school in a safe place and receive quality education, and don't have to hide in basements under the constant bombs and attacks."  See Exhibit G.

**Viktoriia Kuzenkova**, who met Ms. Smelik in 2017, described her as "an irreplaceable part of my American life and a second mother to my children," explaining that "Thanks to Tatyana, my mother Pavlova Iryna Borysivnais, is now safely here with me, slowly overcoming the trauma of war, bombs, and sirens." See Exhibit H.

**Iryna and Oleksandr Dirochian**, restaurant owners from Ukraine, wrote that "From the first days she was always next to us. She translated for us, helped with papers, explained different things, went with us to offices, made phone calls, came to meetings and consultations, always ready to help." See Exhibit I.

**Artem Paskevych** recalled that upon arriving "without knowledge of the language and without understanding many aspects of daily life." Ms. Smelik "accompanied me to banks to open personal and business accounts … and explained many aspects of life in the U.S. that were completely new to me. Furthermore, she provided me with temporary housing and offered moral support during the most difficult moments."  See Exhibit J.

These families now live and work safely in the United States because of her actions. Their words confirm that her offense was not one of exploitation, but the extension of a long-standing pattern of humanitarian service.

**Olga Kozlova**, a Principal Statistical Programmer and long-time friend of seven years, affirmed that Tatyana is a "wonderful friend, a responsive person, a caring mother of 4 children and a loving grandmother of 3 grandchildren". See Exhibit K.

**Elena Bick**, a close friend since 2015, recalled, "Our truck broke down in the mountains, hours away from help, while towing our trailer. We felt stranded and didn't know where to turn. I reached out to Tatyana, who was in Washington at the time. Without hesitation, she drove for hours to bring us a part so we could repair our vehicle." She wrote that she was "shocked and heartbroken" at Ms. Smelik's arrest because she knows her to be "a woman of strong morals and integrity." See Exhibit L.

**Svetlana Shimanskaya**, a real estate worker, has known Ms. Smelik for about seven years and views her as a "kind and positive person" who is "like a light in the dark, always seeing the good in things and ready to help others". See Exhibit M.

**Yana Zaraiska** described how, when her parents arrived from Ukraine, Ms. Smelik "offered them a temporary place to stay in her own home until we could arrange suitable housing." She added, "Her advice is always constructive and grounded in logic and life experience … Her thoughtful guidance saved me from significant mistakes." See Exhibit N.

Her lifelong friend **Svetlana Ivanova**, who has known her for forty years, wrote simply, "Tanya is a person with a big and kind heart. She is always ready to help friends

6

and loved ones, ready to support and help those who need it. Her compassion for others is always sincere." See Exhibit O.

Letters from additional friends and community members, including: **Burak Örün (Exhibit P), Dmytro Brailovskyi (Exhibit Q), Erkan Ozmeric (Exhibit R), Ganna Purliyev (Exhibit S), Ilia Kriukov (Exhibit T), Liudmyla Smielik (Exhibit U), Marina Kazanova (Exhibit V), Viacheslav Runkevich (Exhibit W),** and **Yevgeniya Wolbrecht (Exhibit X)** further attest to Ms. Smelik's compassion, reliability, and selflessness. These individuals, representing diverse professions such as biomedical engineering, aviation, nursing, trucking, and caregiving, describe her as hardworking, principled, and deeply committed to helping others. Many emphasized her willingness to assist newcomers from Ukraine with housing, translations, and daily guidance, often becoming a guarantor or sponsor to those with no other support.

**(2) The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Provide Just Punishment for the Offense; Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.**

A just sentence in this case must be sufficient but not greater than necessary to achieve the purposes of sentencing. Ms. Smelik's offense arose from a humanitarian impulse, not a scheme for profit or deception. She immediately accepted responsibility, pled guilty, and cooperated fully.

A modest sentence will still reflect the seriousness of the offense and promote respect for the law by distinguishing between an intentional fraud for which Ms. Smelik pled guilty to and admits guilt, to a humanitarian act of compassion.

Deterrence, both specific and general, has already been achieved. Ms. Smelik, a 47-year-old first-time offender, has endured the humiliation, expense, and disruption of

prosecution. A felony conviction alone sends a clear message that even well-intentioned felonious misrepresentations carry serious consequences.

The letters, testimony, and undisputed record portray Ms. Smelik as a devoted mother, loyal friend, and civic-minded neighbor who has consistently placed others' needs before her own. Her history confirms this case is a misguided aberration, not a pattern, and that she poses no risk of reoffending.

The public requires no protection from Ms. Smelik. She has no history of violence or deceit and has spent her life caring for others.

A sentence of straight probation or a period of home detention will satisfy all purposes of § 3553(a)(2): it will recognize the seriousness of the offense, deter future misconduct, protect the public, and promote rehabilitation, while remaining no harsher than necessary.

## (3) The Kinds of Sentences Available

In this particular case, the Court may impose a term of probation, imprisonment, or a combination thereof, consistent with the advisory sentencing guidelines and any appropriate variance which the Court may agree is applicable in this matter.

## (4) The Sentencing Range Established by the Guidelines

### (A) Entitled to an Adjustment Under § 2L2.1

The guideline for violation of 18 U.S.C. § 1546(a) is found in § 2L2.1, which establishes a base offense level of 11. A six-level enhancement applies for multiple filings.

- 11 + 6 = 17

Because the offense was committed other than for profit, Ms. Smelik is entitled to a three-level downward adjustment pursuant to § 2L2.1(b)(1).

- 17 – 3 = 14

The Sentencing Guidelines recognize that not all immigration-related document offenses are profit-driven. Section 2L2.1(b)(1) provides a three-level reduction "if the offense was committed other than for profit," meaning without financial gain or commercial advantage.

In *United States v. Torres*, 81 F.3d 900 (9th Cir. 1996), the court denied the reduction where defendants processed fraudulent immigration documents as part of a paid business venture, a "purely financial" enterprise. By contrast, Ms. Smelik's conduct involved no fee, salary, or benefit, she acted out of empathy toward Ukrainian refugees.

The Eleventh Circuit's decision in *United States v. Talisov*, 339 F. App'x 920 (11th Cir. 2009), confirms that the reduction properly applies when a defendant's motive is humanitarian rather than pecuniary. There, the court affirmed a three-level decrease even though another person profited from the offense, because the defendant himself received no financial gain.

Like the defendant in *Talisov*, Ms. Smelik's actions were "other than for profit" within the meaning of § 2L2.1(b)(1). Her filings were driven by compassion, not commerce.

The defendant meets the criteria at § 4C1.1(a)(1)-(10) and is a Zero-Point Offender, resulting in a 2-level reduction.

- 14 – 2 = 12

After acceptance of responsibility under § 3E1.1, the total offense level is anticipated to be 9., resulting in an advisory range of 4 - 10 months at Criminal History Category I.

- 12 – 3 = 9

The Guidelines remain advisory, as this court obviously well knows, not mandatory, following *United States v. Booker,* 543 U.S. 220 (2005). The Court must consider, but is not bound by, this range when determining a sentence sufficient but not greater than necessary to comply with the purposes of § 3553(a).

**(5) Any Pertinent Policy Statement**

Counsel for Ms. Smelik has not identified any policy statement that is particularly pertinent to the facts presented in the instant case.

**(6) The Need to Avoid Sentencing Disparities Among Defendants**

Sentencing data for fiscal years 2020 through 2024 provide a useful overview of how courts have applied U.S.S.G. § 2L2.1, to first-time offenders in Criminal History Category I.

**(A) Jurisdictional Overview**

| Jurisdiction | % Probation/ Other | % Imprisonment | Average Prison Term (Months) | Median Prison Term (Months) |
|---|---|---|---|---|
| **Nationwide** | 31 % | 69 % | 13 mo. | 10 mo. |
| **11th Circuit** | 33 % | 67 % | 19 mo. | 14 mo. |
| **Florida (All Districts)** | 23 % | 77 % | 20 mo. | 13 mo. |
| **Southern District of Florida** | 29 % | 71 % | 30 mo. | 36 mo. |

Nationwide, **31 percent** of § 2L2.1 defendants in Category I received probation or another non-custodial sentence, while 69 percent were sentenced to imprisonment. The average term of imprisonment was 13 months, with a median of 10 months.

In the Eleventh Circuit, **33 percent** received probation or another non-custodial sentence; those sentenced to imprisonment served an average of 19 months (median 14 months).

Within all districts in Florida, **23 percent** received non-custodial sentences, with an average imprisonment term of 20 months (median 13 months).

In the Southern District of Florida, **29 percent** of defendants received probation or another non-custodial sentence, while the remainder served an average of 30 months (median 36 months).

These jurisdictional data show that while imprisonment remains common, non-custodial sentences represent a meaningful portion of § 2L2.1 outcomes.[1] [2]

### (B) Offense-Level Outcomes

| Final Offense Level | Guideline Range (months) | Dataset Type | Defen-dants | % Probation / Fine Only | Avg. Prison Term (mo.) | Median Prison Term (mo.) | % Within Range | % Downward Variance / Departure | % Upward Variance / Departure |
|---|---|---|---|---|---|---|---|---|---|
| 09 | 4-10 | Excluding §5K1.1 | 36 | 47% | 6 | 5 | — | — | — |
|  |  | Including §5K1.1 | 51 | — | — | — | 31% | 39% | 29% |
| 10 | 6-12 | Excluding §5K1.1 | 8 | 50% | 4 | 3 | — | — | — |
|  |  | Including §5K1.1 | 12 | — | — | — | 33% | 33% | 33% |
| 11 | 8-14 | Excluding §5K1.1 | 15 | 27% | 5 | 6 | — | — | — |
|  |  | Including §5K1.1 | 29 | — | — | — | 34% | 48% | 17% |
| 12 | 10–16 | Excluding §5K1.1 | 30 | 30% | 9 | 10 | — | — | — |

---

[1] U.S. Sentencing Commission, Sentencing Outcomes under § 2L2.1, Criminal History Category I (FY 2020–2024).
[2] Data reflect 271 defendants nationwide, 24 in the Eleventh Circuit, 13 in Florida, and 7 in the Southern District of Florida.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Including §5K1.1 | 36 | — | — | — | 36% | 44% | 17% |
| 13 | 12–18 | Excluding §5K1.1 | 17 | 18% | 11 | 12 | — | — | — |
| | | Including §5K1.1 | 23 | — | — | — | 35% | 39% | 26% |
| 14 | 15–21 | Excluding §5K1.1 | 19 | 16% | 14 | 15 | — | — | — |
| | | Including §5K1.1 | 21 | — | — | — | 43% | 43% | 10% |

*All data reflects Criminal History Category I defendants sentenced under U.S.S.G. §2L2.1.*

When analyzed by offense level, outcomes reveal additional patterns. Among defendants at offense levels 09 through 14, corresponding roughly to guideline ranges of 4–21 months, between 16 and 50 percent received probation or fine-only sentences. The remainder were sentenced to imprisonment, averaging 4–14 months, with medians between 3 and 15 months.

A significant share of these sentences reflected the exercise of judicial discretion: approximately 40 percent of defendants at these offense levels received downward variances or departures from the guideline range.

**(7) The Need to Provide Restitution to Victims**

No specific victims have been identified for the purposes of restitution.

**Conclusion:**

Ms. Smelik respectfully requests that her total offense level be determined to be 9 and that pursuant to Section 3553(a) that the Court sentence Ms. Smelik to a sentence of probation or a combination with home confinement.

Respectfully submitted,

Weisberg Kainen Mark, PL
Miami Tower
100 SE 2nd Street, Ste. 2222
Miami, Florida  33131
Phone:  (305) 374-5544
Facsimile No:  (305) 358-8565
dkainen@wkm-law.com

DATE:   October 20, 2025            BY:  /s/ Dennis G. Kainen
                                         Dennis G. Kainen
                                         Florida Bar No. 339393

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Unopposed Motion was electronically filed via CMF/ECF this 20th day of October, 2025.

/s/ Dennis G. Kainen
Dennis G. Kainen